**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Craig Alan Lambert,<br><br>    Plaintiff,<br><br>v.<br><br>Discover Bank,<br><br>    Defendant. | No. CV-24-03593-PHX-SHD<br><br>**ORDER** |

Pending before the Court are Defendant Discover Bank's ("Discover") motion to compel arbitration of Plaintiff Craig Lambert's claims, (Doc. 16), and Lambert's application to proceed *in forma pauperis* ("IFP"), (Doc. 38). For the reasons explained below, Discover's motion is **granted** and Lambert's IFP application is **denied as moot**.[1]

**I.   FACTUAL BACKGROUND**

In July 2013, "a credit card account was opened in [Lambert's] name using his identifiable information," and "a credit card was issued in [his] name and mailed to [his] then domicile" in Maricopa County, Arizona. (Doc. 1-1 at 11; Doc. 16-2 at 2.)[2]

In December 2018, Discover "initiated a legal action against [Lambert] in the

---

[1] Lambert's request for oral argument, (Doc. 18), is denied because the issues are fully briefed and oral argument would not aid the Court's decision process. *See* LRCiv 7.2(f).

[2] Evidence submitted by the parties in connection with a motion to compel arbitration may be considered. *See, e.g.*, *Perez v. DirecTV Grp. Holdings, LLC*, 251 F. Supp. 3d 1328, 1336 (C.D. Cal. 2017) ("A court may consider evidence outside of the pleadings, such as declarations and other documents filed with the court, using a standard similar to the summary judgment standard." (citation modified)).

Encanto Justice Court . . . asserting a claim for a debt allegedly owed" by Lambert to Discover amounting to $6,499.23. (Doc. 1-1 at 11.)

In December 2019, the Encanto Justice Court entered judgment in Discover's favor for the full amount of the debt. (*Id.* at 12.) Lambert appealed to the Maricopa County Superior Court. (*Id.*)

In October 2020, the Superior Court "determined that [Discover], as a bank, was engaging in the business of banking within the State of Arizona without the requisite permitting/licensing," in violation of Arizona statutes. (*Id.*) The Superior Court thus reversed the Encanto Justice Court's decision and vacated the award to Discover. (*Id.*)

In April 2021, Discover filed a second complaint against Lambert in the Encanto Justice Court. (*Id.*) The action was "dismissed with prejudice on January 30, 2024." (*Id.* at 12–13.)

In February 2024, Discover filed an Application for Authority to Transact Business or Conduct Affairs in Arizona with the Arizona Corporation Commission, which was approved in March 2024. (*Id.* at 13.)

Lambert alleges that, until Discover received approval of its application, it "continued in its unlicensed banking operations," including "soliciting business from Arizona residents, establishing new accounts for Arizona residents, . . . engaging in debt collection practices against Arizona residents, [and] initiat[ing] . . . lawsuits within the Arizona court system for accounts deemed in default." (*Id.* at 15.) Lambert also alleges that Discover's lawsuits against him caused him to "suffer undue stress and subsequent medical conditions, which ultimately required corrective surgery." (*Id.*)

Lambert asserts state-law claims for violations of state statute, racketeering, consumer fraud, fraudulent schemes and artifices, deliberate indifference and violation of the collateral attack doctrine, contempt, abuse of process/malicious prosecution, negligence, and unjust enrichment, as well as federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and violations of Federal Deposit Insurance Corporation ("FDIC") regulations. (*Id.* at 16–28.)

## II. PROCEDURAL HISTORY

On November 12, 2024, Lambert filed suit against Discover in Maricopa County Superior Court. (Doc. 1-1 at 9–29.)

On December 17, 2024, Discover removed this action to federal court under diversity jurisdiction under 28 U.S.C. § 1332(a). (*See* Doc. 1 at 2.)

On January 2, 2025, Lambert moved to remand this action back to state court. (Doc. 11.) That motion was fully briefed. (Docs. 17, 19.)

On January 14, 2025, while Lambert's motion to remand was being briefed, Discover filed the motion to compel arbitration. (Doc. 16.)

On January 16, 2025, Lambert filed a response to the motion to compel arbitration. (Doc. 18.)

On January 23, 2025, the Court denied Lambert's motion to remand, holding subject matter jurisdiction was satisfied under both diversity and federal question jurisdiction. (*See* Doc. 20 at 3–4.)

That same day, Discover filed its reply in support of the motion to compel arbitration. (Doc. 21.)

On January 26, 2025, Lambert filed without authorization two replies "in further opposition to" Discover's motion to compel arbitration. (Docs. 22, 23.) These two documents are largely identical.

On July 17, 2025, Lambert filed his IFP application. (Doc. 38.)

## III. DISCUSSION

### A. Legal Standard

The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. It provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* Thus, absent a valid contractual defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on

issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis omitted).

In general, a district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). These two issues are sometimes referred to as the "gateway" questions of arbitrability. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).

### B.     The Arbitration Agreements

Lambert's use of his Discover Card is subject to a Cardmember Agreement (the "Original Contract"), which Discover mailed to Lambert with his Discover card. (Doc. 16-2 at 2.) In September 2017, Discover emailed Lambert an amended Cardmember Agreement (the "Amended Contract"). (*Id.*) "Discover's records reflect that [Lambert] activated and used his Discover Card after receiving his Original [Contract]" and continued to use his account by "making payments" after receiving the Amended Contract. (*Id.* at 3–4.)

The Original Contract and Amended Contract are both governed by "applicable federal law and by Delaware law." (*See* Doc. 16-4 at 4; Doc. 16-5 at 4.) They are also governed by the FAA. (*Id.*)

The Original Contract provided that a user accepted the contract "if [they did] not cancel [the] Account within 30 days after receiving a Card" or if they "use[d] the Account," but a user could "reject the 'Arbitration of Disputes' section." (Doc. 16-2 at 3; Doc. 16-4 at 2.)

#### 1.     Original Contract

The Original Contract contained an arbitration agreement with the following relevant language:

> **Agreement to arbitrate.** In the event of a dispute between you and us arising under or relating to this Account, either may choose to resolve the dispute by binding arbitration, as described below, instead of in court. Any claim (except for a claim challenging the validity or enforceability of this arbitration agreement, including the Class Action Waiver) may be resolved

- 4 -

by binding arbitration if either side requests it.  THIS MEANS IF EITHER YOU OR WE CHOOSE ARBITRATION, NEITHER PARTY SHALL HAVE THE RIGHT TO LITIGATE SUCH CLAIM IN COURT OR TO HAVE A JURY TRIAL.  ALSO DISCOVERY AND APPEAL RIGHTS ARE LIMITED IN ARBITRATION.

(Doc. 16-4 at 4.)  The Original Contract provided for arbitration to "proceed only with the American Arbitration Association (AAA) or JAMS."  (*Id.*)

The Original Contract also contained an opt-out provision:

**You Have the Right to Reject Arbitration for this Account.  You may reject the arbitration agreement but only if we receive from you a written notice of rejection within 30 days of your receipt of the Card after your Account is opened.  You must send the notice of rejection to: Discover, PO Box 30938, Salt Lake City, UT 84130-0938.**  Your rejection notice must include your name, address, phone number, Account number and personal signature.  No one else may sign the rejection notice for you.  Your rejection notice also must not be sent with any other correspondence.  Rejection of arbitration will not affect your other rights or responsibilities under this Agreement.  If you reject arbitration, neither you nor we will be subject to the arbitration provisions for this Account.

(*Id.*)

## 2. Amended Contract

The Amended Contract contained an arbitration agreement with the following relevant language:

**Agreement to arbitrate.**  In the event of a dispute between you and us arising out of or relating to this Account or the relationships resulting from this Account or any other dispute between you or us ("Claim"), either you or we may choose to resolve the Claim by binding arbitration, as described below, instead of in court.  Any Claim (except for a claim challenging the validity or enforceability of this arbitration agreement, including the Class Action Waiver) may be resolved by binding arbitration if either side requests it.  THIS MEANS IF EITHER YOU OR WE CHOOSE ARBITRATION, NEITHER PARTY SHALL HAVE THE RIGHT TO LITIGATE SUCH CLAIM IN COURT OR TO HAVE A JURY TRIAL.  ALSO DISCOVERY AND APPEAL RIGHTS ARE LIMITED IN ARBITRATION.

Even if all parties have opted to litigate a Claim in court, you or we may elect arbitration with respect to any Claim made by a new party or any new claims

- 5 -

later asserted in that lawsuit. . . .

(Doc. 16-5 at 4.) The Amended Contract, like the Original Contract, provides for arbitration through AAA or JAMS. (*Id.*)

The Amended Contract also contains a similar opt-out provision:

> **You Have the Right to Reject Arbitration for this Account.  You may reject the arbitration agreement but only if we receive from you a written notice of rejection within 30 days of your receipt of the Card after your Account is opened.  You must send the notice of rejection to: Discover, PO Box 30938, Salt Lake City, UT 84130-0938.**  Your rejection notice must include your name, address, phone number, Account number and personal signature.  No one else may sign the rejection notice for you.  Your rejection notice also must not be sent with any other correspondence. Rejection of arbitration will not affect your other rights or responsibilities under this Agreement.  If you reject arbitration, neither you nor we will be subject to the arbitration provisions for this Account.  Rejection of arbitration for this Account will not constitute rejection of any prior or future arbitration agreement between you and us.

(*Id.* at 5.)

Discover does not have any record that it received the required notice from Lambert to opt out of the arbitration agreement, as Discover would have "include[d] a note in the computerized account records" if he had received such a notice. (Doc. 16-2 at 4.) Lambert also "activated and used the Account thereafter." (*Id.*; *see also* Docs. 16-6, 16-7.)

**C.     Analysis**

Discover argues that Lambert's claims must be arbitrated because the Original Contract and Amended Contract (collectively, the "Contracts") are governed by the FAA, the parties entered into a valid and binding arbitration agreement under Delaware law, and Lambert's claims fall within the scope of the arbitration agreement. (Doc. 16 at 6–13.) Discover also requests that this action be stayed pending completion of the arbitration. (*Id.* at 13.)

Lambert responds that the arbitration agreement is "unenforceable because the underlying contract is void for illegality," as Discover allegedly "engaged in the business of banking in Arizona for approximately thirty-nine . . . years . . . , without the requisite

- 6 -

licensing, in violation of Arizona law." (Doc. 18 at 2.) He argues that Arizona law provides that contracts formed in violation of the law are void and unenforceable, as is the arbitration agreement. (*Id.* at 4–5.) As for the arbitration agreements, Lambert argues that they cannot be enforced because they are unconscionable. (*See id.* at 12–14.)

In reply, Discover argues that Lambert's challenges to the Contracts must be decided by the arbitrator, because the challenges pertain to the Contracts as a whole rather than the arbitration agreements specifically. (Doc. 21 at 2–5.) Discover also argues that Lambert's challenges to the Contracts fail on the merits. (*Id.* at 5–9.)[3]

Because the Contracts contain arbitration agreements, the only questions that may be addressed are the "gateway issues of arbitrability"—whether a valid agreement to arbitrate exists, and if so, whether the arbitration agreements encompass the claims at issue. *See Rent-A-Center*, 561 U.S. at 68–69; *Chiron Corp.*, 207 F.3d at 1130. Lambert's primary opposition to arbitration, however, is based on his argument that the Contracts were illegal and are therefore void and unenforceable, which Discover argues must be addressed by an arbitrator.

Discover is correct. "Challenges to the validity of arbitration agreements . . . can be divided into two types": (1) "challenges specifically [to] the validity of the agreement to arbitrate" and (2) "challenges [to] the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445–46. This is because arbitration agreements are severable from the remainder of a contract, and "enforceability of the

---

[3] As mentioned, Lambert filed unauthorized sur-replies, (Docs. 22, 23), which will not be considered. *See, e.g.*, *Bond v. Comm'r of Soc. Sec. Admin.*, 2020 WL 2615970, at *1 n.1 (D. Ariz. 2020) ("Surreplies are not permitted in the District of Arizona without the court's approval."); *Kuc v. MTC Fin. Inc.*, 2012 WL 5269208, at *2 (D. Ariz. 2012) ("The Local Rules do not authorize filing a surreply without leave of court."). Furthermore, consideration of Lambert's arguments in the sur-replies would not have changed the conclusions in this Order.

- 7 -

arbitration agreement" does not turn on any particular state's "public policy and contract law." *Id.* at 444, 446 (citation omitted). Thus, it does not matter whether a state's law would make a contract void or voidable—the FAA encompasses contracts that "later prove to be void." *See id.* at 446, 448; *see also Rent-A-Center*, 561 U.S. at 70 (explaining that the FAA holds an arbitration agreement "valid, irrevocable, and enforceable *without mention* of the validity of the contract in which it is contained," so a "party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate" (quotation marks omitted)).

Here, Lambert largely does not challenge the validity of the arbitration agreements themselves—he argues that the Contracts "were void ab initio due to [Discover's] unlicensed banking activities and operation as an illegal enterprise." (Doc. 18 at 5; *see also id.* at 6 ("The Arbitration Agreement is unenforceable because the underlying contracts are void due to [Discover's] unlicensed and illegal banking operations in Arizona.").) He concludes that Discover's "failure to obtain a banking permit invalidates the [Contracts], *including the Arbitration Clauses*." (*Id.* at 4 (emphasis added); *see also id.* at 11–12 ("[T]he illegality of [Discover's] unlicensed operations in Arizona invalidates the [Contracts] in their entirety, including the Arbitration Clauses.").)

These challenges to the Contracts as a whole, however, are not resolved by a court, and instead must be decided by an arbitrator. *See Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1000 (9th Cir. 2010) ("[W]hen a plaintiff's legal challenge is that a contract as a whole is unenforceable, the arbitrator decides the validity of the contract, including derivatively the validity of its constituent provisions (such as the arbitration clause)."); *see also Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1269 (9th Cir. 2006) (en banc) (describing *Buckeye* as holding that "the claim that the contract as a whole, including the arbitration provision, was rendered void *ab initio* . . . was for the arbitrator to decide").

Moreover, Lambert does not argue he never entered into the Contracts at all or, in other words, that the contracts between him and Discover were never formed. *See Buckeye*,

546 U.S. at 444 n.1 ("The issue of the contract's validity is different from the issue [of] whether any agreement between the alleged obligor and obligee was ever concluded."). The crux of most of Lambert's arguments thus concerns the validity of the Contracts overall, which must be decided by the arbitrator. *See id.* at 446, 448; *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) ("[I]f the claim is fraud in the inducement of the *arbitration clause itself*—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract *generally*." (emphases added) (footnote omitted)); *Unite Here Loc. 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 703 (9th Cir. 2022) ("A defense that a law invalidates a contract with an arbitration provision is an issue for the arbitrator to decide.").

Lambert arguably challenges the arbitration agreements in only two instances. First, he argues that these agreements are "substantively unconscionable [because] they deny one party a meaningful opportunity to vindicate their rights." (Doc. 18 at 13.) Lambert reasons that enforcement of the arbitration agreements would "shield [Discover] from accountability for its unlawful and unlicensed operations" and "allow [Discover] to avoid judicial scrutiny for its illegal conduct." (*See id.*) Second, he argues that arbitration proceedings impose limitations in subpoenas and discovery and occur without "public oversight," so "jury trials are the preferred forum." (*Id.* at 14–16.)

Construing Lambert's arguments liberally to challenge the conscionability of the arbitration agreements themselves, *cf. Bridge Fund Cap.*, 622 F.3d at 1002 (holding arguments that an arbitration provision "improperly limit[ed] . . . damages" and "shorten[ed] the statute of limitations" were "arguments marshaled against the validity of the arbitration clause alone" that must be decided by a court); *Adobe Sys. Inc. v. Acheampong*, 2018 WL 6613832, at *5 (N.D. Cal. 2018) (stating that "courts generally read papers filed by *pro se* parties liberally, and will interpret them to raise the strongest arguments that they suggest" (quotation marks omitted)), they are still unavailing.

- 9 -

Arbitration agreements are not unconscionable merely because they are private and provide for different rules and limitations than court actions; such an unconscionability finding would place arbitration agreements on different footing than other contracts, which is not permitted under the FAA. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." (citation omitted)).

In fact, the Supreme Court rejected the argument that arbitration agreements could be found "unconscionable or unenforceable as against public policy" if they "fail to provide for judicially monitored discovery" or "disallow an ultimate disposition by a jury." *See id.* at 341–42; *see also Smith v. Jem Grp., Inc.*, 737 F.3d 636, 641 (9th Cir. 2013) (stating that, in *Concepcion*, the Supreme Court "provided additional examples of arbitration-specific rules that would be preempted by the FAA, such as state rules declaring unconscionable any arbitration clause that does not provide for judicially monitored discovery . . . or requiring final disposition by a jury"). Parties to arbitration agreements have "discretion in designing arbitration processes . . . to allow for efficient, streamlined procedures tailored to the type of dispute," including requiring "that proceedings be kept confidential." *See Concepcion*, 563 U.S. at 344–45.

Lambert's unconscionability argument fails because, in "bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *See id.* at 348 (citation omitted); *id.* (describing the "principal advantage of arbitration" as "its informality"); *see also Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 252 (2017) (holding that a rule that "hing[ed] on the primary characteristic of an arbitration agreement—namely, a waiver of the right to go to court and receive a jury trial"—would "subject the arbitration agreement], by virtue of [its] defining trait, to uncommon barriers," thus violating the FAA). In other words, the differences between arbitration and court actions of which Lambert complains are features of arbitration, not bugs, and cannot serve as a basis to hold

the arbitration agreements unconscionable under the FAA. *See Kindred Nursing*, 581 U.S. at 251 (stating that the FAA "displaces any rule that . . . disfavor[s] contracts that (oh so coincidentally) have the defining features of arbitration agreements"); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) ("[T]he FAA pre-empts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." (quotation marks omitted)).[4]

Finally, Lambert curiously argues that the Superior Court's decision holding Discover could not maintain a debt collection proceeding against him constitutes a "jurisdictional bar" that precludes Discover from enforcing its arbitration agreements. (Doc. 18 at 5–7.) Even assuming Lambert's interpretation of that decision is correct, which is not clear, (*see* Doc. 1-1 at 38–40), such a decision could not preclude Discover from enforcing a valid arbitration agreement under the FAA. *See Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 22 (2012) ("There is no general-specific exception to the Supremacy Clause. When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." (citation modified)).

Because Lambert does not otherwise argue that the arbitration agreements are invalid or that his claims fall outside of the arbitration agreements' scope, any remaining gateway questions of arbitrability will not be addressed *sua sponte*. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–300 (2010) ("Courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor . . . its enforceability or applicability to the dispute *is in issue*. Where a party contests either or both matters, the court must resolve the disagreement."

---

[4] Given this conclusion, the parties' arguments concerning whether the arbitration agreements are unconscionable under state law, (Doc. 18 at 12–16; Doc. 21 at 6–11), need not be addressed. *See, e.g.*, *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) ("The body of federal substantive law generated by elaboration of FAA § 2 is equally binding on state and federal courts." (quotation marks omitted)); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1226 (9th Cir. 2013) ("Section 2 of the FAA . . . *is* the law of California and of every other state. . . . A contract cannot be unenforceable under state law if federal law requires its enforcement . . . .").

(emphasis added) (citation modified)); *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (plurality opinion) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."); *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) ("As arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision is unenforceable.").

Discover's motion to compel arbitration is thus granted. This action is stayed pending conclusion of the arbitration, per Discover's request. (Doc. 16 at 13.) *See* 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024) ("When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration.").

Finally, because this action will be stayed and proceed in arbitration, Lambert's IFP application is denied as moot.

Accordingly,

**IT IS ORDERED** that Discover's motion to compel arbitration (Doc. 16) is **granted**.

**IT IS FURTHER ORDERED** that this action is stayed pending completion of the parties' arbitration.

**IT IS FURTHER ORDERED** that the parties shall file a Joint Status Report within one week of the arbitrator's decision or six months of this Order, whichever is sooner.

**IT IS FURTHER ORDERED** that Lambert's IFP application (Doc. 38) is **denied as moot**.

Dated this 15th day of September, 2025.

_____
Honorable Sharad H. Desai
United States District Judge